In re the Marriage of Blanca Margarita ZALDIVAR n/k/a Parada, petitioner, Respondent,

v.

Luis Roberto Zaldivar RODRIGUEZ, Appellant,

Watonwan County, Respondent.

No. A11–1632.

Court of Appeals of Minnesota.

July 30, 2012.

Blanca Margarita Parada, Butterfield, MN, pro se respondent.

Mark E. Betters, Betters Weinandt, Ltd., Mankato, MN, for appellant.

Stephen Lindee, Watonwan County Attorney, Charles W. Hanson, Assistant County Attorney, St. James, MN, for respondent Watonwan County.

Considered and decided by JOHNSON, Chief Judge; STONEBURNER, Judge; and BJORKMAN, Judge.

## OPINION

JOHNSON, Chief Judge.

In 2007, the Watonwan County District Court ordered a citizen of El Salvador, who at that time was not authorized to reside or work within the United States, to pay child support to his former wife, for the benefit of their young daughter. In

2011, the district court held the former husband in civil contempt of court for his failure to pay child support and ordered him to serve 90 days in the county jail unless he satisfied certain purge conditions. On appeal, he argues that, as a matter of law, he may not be held in civil contempt for his failure to pay child support because he may not be employed consistent with federal immigration law. He also challenges certain findings of fact on which the district court's contempt order is based. We conclude that an unauthorized alien is not categorically exempt from Minnesota's child-support obligations, and we further conclude that the district court's orders in this case do not conflict with federal immigration law. We also conclude that the district court did not clearly err in its factual findings. Therefore, we affirm.

### FACTS

Luis Roberto Zaldivar Rodriguez is a native and citizen of El Salvador, where he was trained as a physician. In 1993, he married a woman now known as Blanca Margarita Parada. Zaldivar and Parada moved to Minnesota in September 2000 with their daughter, who then was four years old. Their marriage was dissolved by the Watonwan County District Court in 2003. At the time of the dissolution, the district court did not order either party to pay child support.

In 2007, approximately four years after the dissolution, Watonwan County moved to establish a child-support obligation for Zaldivar. Zaldivar opposed the motion on the ground that he has no income and, thus, no ability to pay child support. In August 2007, the district court ordered Zaldivar to pay child support of $320 per month. Zaldivar appealed, and this court affirmed. *Zaldivar v. Zaldivar*, No. A07–2057, 2008 WL 3290537, *3 (Minn.App.

Aug. 5, 2008), *review denied* (Minn. Sept. 23, 2008).

In July 2010, Watonwan County brought a motion to hold Zaldivar in contempt due to his failure to pay child support. At that time, his arrearage was approximately $16,000. Shortly thereafter, in September 2010, Watonwan County moved to modify Zaldivar's child-support obligation and to establish a medical-support obligation. In October 2010, a child-support magistrate reduced Zaldivar's child-support obligation to $313 per month to reflect the statutory child-support guidelines but imposed a medical-support obligation of $62 per month. Thus, Zaldivar's total support obligation was increased to $375 per month.

In November 2010, the district court held a hearing on the county's contempt motion. The county introduced into evidence the original child-support order from August 2007, the child-support modification order from October 2010, and an affidavit of a county child-support officer. Neither party presented the testimony of any witnesses.

In February 2011, the district court issued an order holding Zaldivar in contempt of court for failing to pay his child-support obligation. The district court found that Zaldivar "failed to offer any justification for noncompliance" with the order to pay child support. The district court referred to the August 2007 child-support order, in which the district court found that Zaldivar earned $1,616 per month while working at a beef plant from December 2005 to November 2006. The district court also referred to the August 2007 hearing, at which Zaldivar testified, as well as the October 2010 modification hearing, at which Zaldivar invoked his Fifth Amendment right against self-incrimination. The district court explained: "Respondent [Zaldivar] did not offer evidence of any income, refused to provide

any testimony regarding his efforts to obtain legal working status, and invoked his Fifth Amendment self-incrimination privilege; therefore, the Court has limited information pertaining to his earning capacity, financial status, and earnings history." The district court concluded:

Respondent [Zaldivar] has managed to find a way to financially support himself during the last several years. Respondent testified he lives off the support of friends and an inheritance; however, he has never disclosed specific details regarding the value of these gifts or inheritance. Respondent invoked his Fifth Amendment self-incrimination privilege in refusing to provide such information. Consequently, the Court is permitted to draw adverse inferences against him.

The district court ordered Zaldivar to serve 90 days in the Watonwan County jail but stayed the order on the following conditions:

a. Respondent shall pay his child support obligation in full.

b. Respondent shall continue to make payments until the child covered by the Order reaches the age of 18, or age 20 if still in secondary school; or until the child becomes emancipated or dies; or until further order.

c. Respondent shall provide proof of at least two job searches per week to the Watonwan County Child Support Office, including copies of all applications and rejection letters from employers.

d. Respondent shall contact the child support office at least once per week.

e. Respondent shall immediately notify the County of all changes in employment and address.

In March 2011, Zaldivar sought appellate review of the district court's finding of contempt by way of a petition for discretionary review, but this court denied the petition. *In re Marriage of Zaldivar*, No. A11–513, —— N.W.2d —— (Minn.App. May 3, 2011) (order).

In July 2011, the district court held a hearing concerning whether to lift the stay of Zaldivar's 90–day term of confinement. A county child-support officer testified that Zaldivar had not made a child-support payment in several years and that his arrearage was approximately $21,000. She also testified that Zaldivar had submitted only 23 applications for employment, fewer than the 38 applications required to comply with the district court's order. She further testified that Zaldivar had not contacted her since March 2011 despite the requirement that he do so weekly. Zaldivar called as witnesses two friends who had given him cash gifts. One friend testified that he gave Zaldivar approximately $4,000 during the previous year, and another friend testified that he gave Zaldivar approximately $10,000 during the previous two years. Zaldivar testified that he is not authorized by law to work in the United States.

In July 2011, the district court issued an order in which it found that Zaldivar had not demonstrated an inability to pay child support. The district court found that Zaldivar's "present immigration status is not a dispositive factor in his inability to contribute something to child support" and that "[t]he evidence shows that he has received $14,000 apparently tax free and has used none of it to pay his child support." The district court concluded that Zaldivar violated the conditions of the order staying his jail term. The district court ordered Zaldivar to report to the Watonwan County jail to serve the 90–day term. Zaldivar did not report to jail, and the district court issued a warrant for his arrest. Zaldivar appeals.

## ISSUES

I. Did the district court err by holding Zaldivar in contempt of court for failing to

pay child support despite the fact that he is not authorized by federal immigration law to work in the United States?

II. Did the district court clearly err when making the findings necessary to hold Zaldivar in contempt of court?

## ANALYSIS

Zaldivar has asserted multiple arguments for reversal of the district court's orders, some of which are repetitious of each other. For purposes of an orderly analysis of Zaldivar's arguments, we have reorganized the relevant issues and sub-issues.

## I.

■ Zaldivar's primary argument on appeal is based on the undisputed fact that he is not authorized by federal immigration law to work in the United States. Zaldivar argues that, in light of his status as an unauthorized alien, the district court erred in February 2011 when it found him in contempt of court for failing to pay his child-support obligation and erred in July 2011 when it ordered him to serve 90 days in jail. We apply a *de novo* standard of review to this argument, which concerns the interpretation of a statute and its application to undisputed facts. *See Becker v. Mayo Found.*, 737 N.W.2d 200, 207 (Minn.2007); *Hennepin Cnty. v. Hill*, 777 N.W.2d 252, 254 (Minn.App.2010).

When a district court considers imposing a child-support obligation, the district court must apply a rebuttable presumption that a parent can be gainfully employed on a full-time basis. Minn.Stat. § 518A.32, subd. 1 (2010). If a parent is unemployed, a district court may consider the parent's potential income, which may be determined by one of three methods: (1) the parent's "employment potential, recent work history, and occupational qualifications"; (2) the parent's receipt of unemployment compensation or workers' compensation; or (3) an imputed amount of income equal to 150% of the federal minimum wage. *See id.*, subd. 2. In this case, the district court relied on the first of these three alternatives by looking at Zaldivar's "employment history, education, and job skills."

■ When a district court considers whether to hold a child-support obligor in contempt of court for failure to pay child support, the existing child-support order "constitutes prima facie evidence that the obligor has the ability to pay the award." Minn.Stat. § 518A.71 (2010). Accordingly, the child-support obligor "is presumed to have an income from a source sufficient to pay the maintenance or support order." *Id.* "If the obligor disobeys the order, it is prima facie evidence of contempt." *Id.* A child-support obligor may avoid a finding of contempt only by proving his or her inability to comply with the order, and the obligor has the burden of persuasion on that issue. *Crockarell v. Crockarell*, 631 N.W.2d 829, 833 (Minn.App.2001), *review denied* (Minn. Oct. 16, 2001).

Zaldivar contends that these provisions of the Minnesota Statutes cannot be applied to a person who is not authorized by law to work in the United States. He reasons that because it is a federal criminal offense for an employer to hire and employ him, he cannot earn an income and, thus, cannot comply with his child support obligation. Zaldivar is correct insofar as he states that, under the federal Immigration Reform and Control Act of 1986 ("IRCA"), it is unlawful for an employer to employ an unauthorized alien. 8 U.S.C. § 1324a(a) (2006). Employers who knowingly violate this prohibition may face both civil fines and criminal prosecution. 8 U.S.C. § 1324a(e)(4)(A), (f)(1). But the same types of sanctions do not apply to an unauthorized alien who seeks or obtains

employment in the United States. An unauthorized alien who works in the United States without authorization may be subject to criminal prosecution only if he or she knowingly uses forged, counterfeit, altered, or falsely-made documents to obtain employment. 8 U.S.C. § 1324c(a)(1)–(3) (2006); 18 U.S.C. § 1546(a), (b) (2006). Thus, as a practical matter, an unauthorized alien can work in the United States without risk of criminal punishment, even if such employment is inconsistent with an employer's restrictions under federal immigration law.

An unauthorized alien's ability to seek and find work was at issue in *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324 (Minn.2003), albeit in a different context. In *Correa*, an unauthorized alien sought workers' compensation benefits after being injured on the job. *Id.* at 325, 327. Under the applicable workers' compensation statute, the alien's receipt of benefits was conditioned on a diligent job search. *Id.* at 327. The employer argued that the alien was unable, as a matter of law, to satisfy the diligent-search condition because he was not authorized to work in the United States. *Id.* Both an administrative law judge and the Workers' Compensation Court of Appeals concluded that Correa's status as an unauthorized alien did not, as a matter of law, prevent him from conducting a reasonable and diligent job search. *See id.*

The supreme court affirmed and held that the employee was not disqualified from receiving workers' compensation benefits on the ground that he was an unauthorized alien. *Id.* at 331. The supreme court's opinion in *Correa* was based in part on federal immigration law:

> As written, the IRCA does not prohibit unauthorized aliens from receiving state workers' compensation benefits generally or temporary total disability benefits conditioned on a diligent job search specifically. The focus of the IRCA is on preventing employers from hiring unauthorized aliens. Aside from the prohibition on tendering fraudulent documents, the IRCA does not prohibit unauthorized aliens from seeking or accepting employment in the United States....[1] The IRCA is not aimed at impairing existing state labor protections.... Thus, we conclude that the IRCA was not intended to preclude the authority of states to award workers' compensation benefits to unauthorized aliens.

*Id.* at 329. The supreme court's opinion in *Correa* also was based on Minnesota's workers' compensation statute. The supreme court reasoned that "the clear language of the Act does not distinguish between authorized and unauthorized aliens." *Id.* The supreme court further reasoned that "the statutory provision governing temporary total disability does not exclude unauthorized aliens from receiving temporary total disability benefits conditioned on a diligent job search." *Id.* at 330. The supreme court concluded "that the words of the Act, when given their plain meaning, permit unauthorized aliens to receive temporary total disability benefits conditioned on a diligent job search." *Id.*

---

1. Since *Correa*, the United States Supreme Court has stated that some civil penalties may be imposed on aliens who accept or engage in unauthorized work. *Arizona v. United States*, —— U.S. ——, ——, 132 S.Ct. 2492, 2504, 183 L.Ed.2d 351, —— (2012). Specifically, the Supreme Court identified two potential civil consequences for an unauthorized alien who seeks or obtains employment. First, an unauthorized alien who accepts employment may become ineligible for lawful permanent resident status. *Id.* (citing 8 U.S.C. § 1255(c)(2), (c)(8)). Second, an unauthorized alien who accepts employment may be removed from the country. *Id.* (citing 8 U.S.C. § 1227(a)(1)(C)(i); 8 C.F.R. § 214.1(e)).

In the course of its opinion in *Correa*, the Minnesota Supreme Court discussed the United States Supreme Court's opinion in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002), which considered a similar issue in the context of a grievance arbitration conducted pursuant to federal labor law. *Correa*, 664 N.W.2d at 330–31. The *Correa* opinion recognized that *Hoffman* held that "the federal immigration policy underlying the IRCA precludes an award of backpay to an unauthorized alien who was unlawfully discharged for participating in union activity." *Correa*, 664 N.W.2d at 330 (citing *Hoffman*, 535 U.S. at 140, 122 S.Ct. at 1278). The *Hoffman* Court reasoned that "under IRCA it is impossible for an unauthorized alien to obtain employment 'without some party directly contravening explicit congressional policies.'" *Id.* at 330 (quoting *Hoffman*, 535 U.S. at 148, 122 S.Ct. at 1283). Accordingly, the *Hoffman* Court held that the National Labor Relations Board was foreclosed from interpreting the federal National Labor Relations Act to permit a back-pay award to an unauthorized alien. *Hoffman*, 535 U.S. at 140, 122 S.Ct. at 1278. In *Correa*, however, the Minnesota Supreme Court rejected the reasoning of *Hoffman*. Our supreme court reasoned that the state legislature is the appropriate body to determine whether an unauthorized alien who is otherwise entitled to workers' compensation benefits should be disentitled on the basis of his or her immigration status. *Correa*, 664 N.W.2d at 331.

In light of *Correa*, we analyze Zaldivar's argument by asking two questions. First, is federal immigration law "intended to preclude the authority of states to" hold unauthorized aliens in contempt of court for failure to satisfy child-support obligations? *See id.* at 329. We answer this question in the negative because federal immigration law "does not prohibit unau-thorized aliens from" being held in contempt of court for failure to pay child support, either generally or specifically. *See id.* Second, does Minnesota's child-support statute permit a district court to hold unauthorized aliens in contempt of court for failure to satisfy child-support obligations? *See id.* at 330. We answer this question in the affirmative because, like the workers' compensation statute, Minnesota's child-support statute "does not distinguish between authorized and un-authorized aliens," *id.* at 329, and "does not exclude unauthorized aliens from" either paying or receiving child support. *See id.* at 330. As was true in *Correa*, it is the role of the legislature, not the courts, to determine whether unauthorized aliens who are otherwise obligated to pay child support should be relieved of those obligations due to their immigration status. *See Correa*, 664 N.W.2d at 331. Thus, a district court is not necessarily precluded from holding an unauthorized alien in contempt of court for failing to pay child support.

■ Having concluded that Minnesota's child-support statute may be applied to unauthorized aliens in a manner that is consistent with federal immigration law, we still must consider whether the district court's orders in this case conflict with the prohibitions of federal immigration law. The district court's February 2011 order imposes purge conditions that, among other things, require Zaldivar to apply for two jobs each week and to submit documented proof of his job search to the county. By its terms, the district court's February 2011 order does not place Zaldivar in violation of the criminal prohibitions of federal immigration law. Zaldivar may comply with the order without facing criminal consequences so long as he does not knowingly use forged, counterfeit, altered, or false-

ly-made documents. *See* 8 U.S.C. § 1324c(a)(1)–(3); 18 U.S.C. § 1546(a),(b).[2]

Thus, the district court did not err by ordering Zaldivar to pay child support or by holding him in contempt of court on the ground that Zaldivar is an unauthorized alien.

## II.

Zaldivar argues that the district court erred in certain factual findings in its contempt order or in failing to make findings that are required by law. This court applies a clearly erroneous standard of review to a district court's factual findings in contempt proceedings. *Mower Cnty. Human Servs. v. Swancutt*, 551 N.W.2d 219, 222 (Minn.1996).

■■■ A district court may hold a person in either civil contempt or criminal contempt. A contempt order is civil in nature, rather than criminal, if it is remedial and if its purpose is to coerce compliance with an existing order. *Mower Cnty.*, 551 N.W.2d at 222. "Civil contempt sanctions are intended to operate in a prospective manner and are designed to compel future compliance with a court order." *Id.* The form of the proceeding may indicate whether it is intended as a civil or a criminal matter. *Id.* In this case, the form of the proceeding indicates that the district court's contempt order is intended to be civil in nature. Watonwan County brought a motion for contempt on behalf of Parada,

a private citizen; the county attorney did not commence a criminal prosecution on behalf of the state. *See id.* The contempt order also includes purge conditions that permit Zaldivar to avoid serving the full 90–day jail term, which may be "distinguished from a determinate sentence in the traditional criminal proceeding." *Id.* Similar contempt proceedings in other child-support cases have been characterized as civil in nature. *See id.; see also Hopp v. Hopp*, 279 Minn. 170, 173, 156 N.W.2d 212, 216 (1968); *Crockarell*, 631 N.W.2d at 833; D.D. Wozniak & Cynthia L. Lehr, *Dealing with a Double–Edged Sword: A Practical Guide to Contempt Law in Minnesota*, 18 Wm. Mitchell L.Rev. 7, 11–12 (1992).

■■■ When holding a person in civil contempt, a district court must satisfy certain essential procedural requirements, namely:

(1) ... jurisdiction over the subject matter and the person;

(2) a clear definition of the acts to be performed;

(3) notice of the acts to be performed and a reasonable time within which to comply;

(4) an application by the party seeking enforcement giving specific grounds for complaint;

(5) a hearing, after due notice, to give the nonperforming party an opportunity

---

**2.** As stated in footnote 1, an unauthorized alien who applies for or obtains employment may be subject to certain civil consequences under federal immigration law. Zaldivar did not raise either of these civil consequences in the district court or in his brief to this court. With respect to the first type of civil consequence, the record is silent as to whether Zaldivar has applied to adjust his immigration status to that of a permanent resident. Thus, we do not answer the question whether a district court may require an alien to apply for employment if the alien is seeking to ad-

just his status, or the question whether a district court may require an alien to apply for employment if the alien intends to adjust his status in the future. *See* 8 U.S.C. § 1255(c)(2), (c)(8). With respect to the second type of civil consequence, Zaldivar admitted that he has overstayed his original nonimmigrant tourist visa by several years, so it appears that he already is removable. *See* 8 U.S.C. § 1227(a)(1)(C)(i) (2006) Thus, Zaldivar has not demonstrated that the district court's orders subjected him to any civil consequences that he was not already facing.

to show compliance or the reasons for failure;

(6) a formal determination by the court of failure to comply and, if so, whether conditional confinement will aid compliance;

(7) an opportunity for the nonperforming party to show inability to comply despite a good faith effort; and

(8) the contemnor's ability to gain release through compliance or a good faith effort to comply.

*Mower Cnty.*, 551 N.W.2d at 223 (citing *Hopp*, 279 Minn. at 174–75, 156 N.W.2d at 216–17); *see also* Wozniak & Lehr, *supra*, at 14–15.

 The purpose of civil contempt proceedings is "to induce future performance of a valid court order, not to punish for past failure to perform." *Mahady v. Mahady*, 448 N.W.2d 888, 890 (Minn.App. 1989). Accordingly, "[w]hen the contempt consists in the omission to perform an act which is yet in the power of the person to perform, the person may be imprisoned until the person performs it, and in such case the act shall be specified in the warrant of commitment." Minn.Stat. § 588.12 (2010). Consistent with these principles, a district court must find "that the obligor ha[s] the ability to pay the obligations," that "the contemnor has the ability to meet" certain purge conditions, and that "conditional confinement is 'reasonably likely to produce compliance.'" *Mahady*, 448 N.W.2d at 890 (quoting *Hopp*, 279 Minn. at 175, 156 N.W.2d at 217).

## A. Ability to Pay

 Zaldivar argues that the district court erred by finding that he has the ability to pay child support. Specifically, Zaldivar challenges the district court's findings that he "is physically and mentally capable of complying with the [child-support] Order and has failed to offer any justification for noncompliance."

 In contempt proceedings, Zaldivar has the burden to prove his inability to comply with the district court's child-support order. *Crockarell*, 631 N.W.2d at 833. In addition, he must overcome a rebuttable presumption that he can be gainfully employed on a full-time basis. Minn.Stat. § 518A.32, subd. 1. The district court rejected Zaldivar's excuse for his unemployment (that he is an unauthorized alien) by referring back to the August 2007 child-support order, in which the district court found that Zaldivar earned $1,616 per month while working at a beef plant between December 2005 and November 2006. The district court also relied on evidence that Zaldivar had previously worked at a tire business in northern Iowa and a corn-related business in southern Minnesota. Based on that evidence, the district court previously determined that Zaldivar was voluntarily unemployed and determined his potential income based on the income he earned between December 2005 and November 2006. *See* Minn.Stat. § 518A.32, subds. 1, 2. In light of the prior finding of potential income, the district court found that Zaldivar did not rebut the presumption that he is able to comply with the child-support order. *See* Minn.Stat. §§ 518A.32, subd. 1, .71; *Crockarell*, 631 N.W.2d at 833.

 These findings are supported by the evidence in the district court record. The district court was permitted to rely on prior evidence and findings concerning Zaldivar's employment history. In addition, Zaldivar testified at the contempt hearing that he has no physical limitations that would prevent him from working. The district court also properly relied on evidence that Zaldivar had supported himself in recent years through cash gifts from friends. *See Barnier v. Wells*, 476

N.W.2d 795, 797 (Minn.App.1991). "[T]here is no statutory requirement that the court determine how an obligor access the money necessary to meet the purge conditions, only that it determine the obligor is able to meet them." *Crockarell,* 631 N.W.2d at 837. Thus, the district court did not clearly err in its finding that Zaldivar is able to pay child support.

### B. Likelihood of Compliance

■ Zaldivar also argues that the district court erred by finding that "[c]onditional confinement is reasonably likely to produce compliance."

■ The district court's February 2011 contempt order rejected Zaldivar's arguments about his professed lack of means, noting that Zaldivar had managed to financially support himself for several years. The district court also drew an adverse inference against Zaldivar on this issue because he had refused to disclose details about the value of an inheritance by refusing to testify at the October 2010 child-support modification hearing. A district court may draw an adverse inference against a contemnor who faces incarceration because "[o]ften, only the alleged contemnor can testify as to his or her reasons for failure to comply." *Crockarell,* 631 N.W.2d at 833 (quotation omitted). Thus, the district court considered the entirety of Zaldivar's financial resources and determined that he would be likely to comply with the purge conditions. In light of the evidence in the record, we cannot conclude that this finding is clearly erroneous.

### C. Statement of Purge Conditions

■ Zaldivar also argues that the district court erred by not stating the purge conditions in its July 2011 order, which imposed the stayed 90–day sentence.

■ A civil contempt order "must allow the contemnor to obtain release by compliance." *Mahady,* 448 N.W.2d at 890. A district court's contempt order must specify clearly the act or acts that the contemnor is required to perform. Minn. Stat. § 588.12. Thus, a civil contempt order must state certain purge conditions that will allow a person to be released from jail. *See Mahady,* 448 N.W.2d at 890.

The district court's July 2011 order recited the February 2011 purge conditions, which were the basis of the stay of Zaldivar's jail term. The July 2011 order does not contradict or remove those purge conditions. Read together, the February 2011 and July 2011 orders clearly explain to Zaldivar that his freedom from incarceration is contingent on his compliance with the purge conditions. The orders clearly explain that Zaldivar holds the keys to his jail cell. Thus, the district court did provide purge conditions in its July 2011 order.

### DECISION

The district court did not err by holding Zaldivar in contempt of court for failure to pay child support, despite his status as an unauthorized alien. The district court did not err by finding that Zaldivar is able to comply with his child-support obligation, by finding that contempt likely would lead to Zaldivar's compliance with his child-support obligation, or by not restating the applicable purge conditions in its final order.

**Affirmed.**

STONEBURNER, Judge (concurring specially).

Because the record indicates that appellant has access to funds from which he could be making some contribution toward his support obligation, I concur with the majority in affirming the finding of civil

contempt. But I would hold that a district court abuses its discretion by requiring, as a purge-of-contempt condition, that a person who is not legally authorized to work in the United States apply for a certain number of jobs every week.

A condition of purge should be tailored, given the circumstances of an individual case, to secure compliance with the order to be enforced. The fact that appellant cannot be criminally prosecuted for applying for jobs, or even for working in the United States, does not make the requirement a proper contempt-purge condition in this case. Requiring appellant to apply for jobs, at worst, implies that the district court expects employers to violate federal law by hiring an illegal immigrant so that he can fulfill a child-support obligation. At the very least, the requirement wastes an employer's time in processing an application that cannot legally lead to employment. The Minnesota judiciary should not create such an implication and should not waste the time of employers in a futile exercise. For these reasons, I would hold that a district court abuses its discretion by requiring, as a contempt-purge condition, that a person who cannot legally work in the United States document that the person is applying for work that cannot be legally offered.